TRINITY MEDICAL CENTER,
INC., Petitioner

v.

Honorable Gary A. HOLUM, Judge of the
District Court, Ward County, North Da-
kota, Michael K. Keplin and Mark An-
thony De Naples, Respondents.

TRINITY MEDICAL CENTER,
INC., Petitioner

v.

The Honorable Gary A. HOLUM, Judge of
the District Court, Ward County, North
Dakota, and Phyllis Hagen, Respon-
dents.

TRINITY MEDICAL CENTER, INC.,
David M. Burnette and Radiology
Consultants, P.C., Petitioners

v.

The Honorable Gary A. HOLUM, Judge of
the District Court, Ward County, North
Dakota, Robert D. Sivertson and Mark
Anthony De Naples, Respondents.

Civ. Nos. 950284, 950288 and 950289.

Supreme Court of North Dakota.

Feb. 28, 1996.

Randall Hanson (argued) and Patrick J. Maddock (appearance), of Camrud, Maddock, Olson & Larson, Ltd., Grand Forks, for petitioner Trinity Medical Center.

Brenda L. Blazer (appearance), of Zuger Kirmis & Smith, Bismarck, for petitioners David M. Burnette and Radiology Consultants, P.C.

Charles L. Neff (argued), of Bjella, Neff, Rathert, Wahl & Eiken, P.C., Williston, for respondent Michael K. Keplin.

Alvin O. Boucher (argued), of Robert Vogel Law Office, P.C., Grand Forks, for respondent Phyllis Hagen.

Roger R. Sundling (argued), of Robert Vogel Law Office, P.C., Grand Forks, for respondent Robert D. Sivertson.

Mark De Naples, Las Vegas, Nev., pro se.

John C. Kapsner, of Kapsner & Kapsner, Bismarck, for amicus curiae North Dakota Hospital Association. Submitted on brief.

LEVINE, Justice.

Trinity Medical Center, Inc. [Trinity], Dr. David Burnette, and Radiology Consultants, P.C., have petitioned this court for a supervisory writ to vacate a district court order compelling discovery. We conclude that this is an appropriate case to exercise our supervisory jurisdiction, and we direct the district court to vacate its June 30, 1995 discovery order and to enter an order in accordance with this opinion.

## I. FACTS

Desiring to establish a neurosurgery department at its Minot hospital, Trinity, in 1990, recruited Dr. Mark De Naples, a neurosurgeon from Columbus, Mississippi, to relocate his practice to Minot. In addition to staffing and equipping its hospital to support a neurosurgeon, Trinity provided financial incentives to Dr. De Naples.

In July 1991, Michael Keplin broke his neck in a car accident. He was taken to Trinity, where Dr. De Naples performed surgery to fuse the break in Keplin's neck. Dr. De Naples operated at the wrong location of Keplin's spine and, despite four weeks of post-operative care at Trinity, Keplin was released from the hospital with his neck still broken. Keplin alleges that he suffered permanent and debilitating injuries resulting from Dr. De Naples's negligent treatment.

Phyllis Hagen suffered a fractured vertebra in her neck in a July 1991 car accident. Dr. De Naples performed surgery at Trinity to fuse the broken vertebra, but again operated on the wrong part of the patient's body and fused the wrong vertebrae. Hagen asserts that she first learned of the negligent surgery nearly a year later, and that she suffered permanent debilitating injuries.

In January 1992, Robert Sivertson sustained a broken vertebra in his neck in a car accident. Dr. De Naples performed two surgeries upon Sivertson at Trinity. On each occasion, Dr. De Naples erroneously operated on Sivertson's back, when he was supposed to operate on Sivertson's neck. Sivertson alleges that he suffered permanent injuries resulting from Dr. De Naples's improper treatment.

Dr. De Naples resigned from Trinity's medical staff in 1992. After practicing a short time in New Mexico, Dr. De Naples retired to Las Vegas and declared bankruptcy. He has since been diagnosed with Alzheimer's Disease.

Keplin, Hagen, and Sivertson each sued Trinity, alleging that Dr. De Naples was an agent of Trinity, that Trinity negligently supervised Dr. De Naples, and that Trinity negligently credentialed Dr. De Naples to practice at Trinity. Keplin also sued Dr. De Naples, and Sivertson also sued Dr. De Naples, Dr. David Burnette, and Radiology Consultants, P.C. The three cases have been consolidated for discovery.

Disputes arose during discovery over application of the peer review/quality assurance privilege, codified in Sections 23–01–02.1 and 31–08–01, N.D.C.C. Keplin[1] sought, through interrogatories and depositions, to elicit information relating to Dr. De Naples's practice at Trinity, and specific information regarding any in-hospital review of Dr. De Naples's care of these plaintiffs. Trinity[2] objected, asserting application of the statutory privilege and urging an expansive reading of the privilege to cover all documents and information produced, collected, or presented in the entire quality assurance process. Keplin urged a narrow view of the privilege to cover only testimony to and discussions of the quality assurance committee. After briefing and a hearing, the district court, on June 30, 1995, issued its order directing Trinity to produce all requested information and documents, and to produce individuals requested for depositions, except:

> "Any complaints regarding Dr. DeNaples made by physicians, nurses or hospital staff to the internal Quality Assurance Committee and any records of those complaints, or discussions of those complaints, with the internal Quality Assurance Committee."

The district court granted Trinity's motion for a stay pending application to this court for a supervisory writ.

## II. JURISDICTION

We first determine whether this is an appropriate case to exercise our supervisory jurisdiction. Our authority to issue supervisory writs is derived from Article VI, Section 2 of the North Dakota Constitution. *Heringer v. Haskell,* 536 N.W.2d 362, 364 (N.D.1995); *Reems ex rel. Reems v. Hunke,* 509 N.W.2d 45, 47 (N.D.1993). The power to issue a supervisory writ is discretionary with this court and cannot be invoked as a matter of right. *Heringer, supra,* 536 N.W.2d at 364. Superintending control over inferior courts is used only to rectify errors and prevent injustice in extraordinary cases where no adequate alternative remedy exists. *Heringer, supra,* 536 N.W.2d at 364–365; *Reems, supra,* 509 N.W.2d at 47.

---

1. For brevity, we will hereafter refer to Keplin, Hagen, and Sivertson collectively as "Keplin."

2. For brevity, we will hereafter refer to Trinity, Burnette, and Radiology Consultants collectively as "Trinity."

 The district court order compelling Trinity to produce the requested documents and information is not appealable, and Trinity has no other recourse but to produce the information or be held in contempt. *See Reems, supra,* 509 N.W.2d at 47; *Polum v. North Dakota District Court,* 450 N.W.2d 761, 763 (N.D.1990). Trinity has no viable alternative remedy to a supervisory writ. We therefore conclude this case is appropriate for exercise of our supervisory jurisdiction.

## III. SCOPE OF THE PRIVILEGE

The medical peer review privilege is codified at Sections 23–01–02.1 and 31–08–01, N.D.C.C. Section 23–01–02.1 says in pertinent part:

> *"23–01–02.1. Hospital utilization committees—Internal quality assurance review committees—Reports—Immunity.* Any information, data, reports, or records made available to a mandatory hospital committee or extended care facility committee as required by state or federal law or by the joint commission on accreditation of hospitals by a hospital or extended care facility or any physician or surgeon or group of physicians or surgeons operating a clinic or outpatient care facility in this state or to an internal quality assurance review committee of any hospital or extended care facility in this state are confidential and may be used by such committees and the members thereof only in the exercise of the proper functions of the committees. The proceedings and records of such a committee are not subject to subpoena or discovery or introduction into evidence in any civil action arising out of any matter which is the subject of consideration by the committee. Information, documents, or records otherwise available from original sources are not immune from discovery or use in any civil action merely because they were presented during the proceedings of such a committee, nor may any person who testified before such a committee or who is a member of it be prevented from testifying as to matters within that person's knowledge, but a witness cannot be asked about that witness' testimony before the committee."

Section 31–08–01, governing admissibility of business records, says in pertinent part:

> "The records and proceedings of any regularly constituted medical review committee of a licensed medical hospital or a medical society in this state shall not be subject to discovery or admissible as evidence."

The parties disagree about the answers to two fundamental questions arising under the statutes: Which hospital committees are covered by the privilege and what information and documents are protected?

 Rule 501, N.D.R.Evid., requires that, unless expressly privileged by constitution, statute, or rule, no person may refuse to be a witness, refuse to disclose any matter, refuse to produce any object or writing, or prevent anyone else from so disclosing or producing. *State v. Red Paint,* 311 N.W.2d 182, 185 (N.D.1981). Evidentiary privileges must be narrowly construed because they are in derogation of the search for truth. *E.g., State v. Schroeder,* 524 N.W.2d 837, 840 (N.D.1994); *Rudh v. Rudh,* 517 N.W.2d 632, 637 (N.D.1994); *see also United States v. Nixon,* 418 U.S. 683, 710, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039, 1065 (1974) ("these exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth"). As we explained in *State v. Red Paint, supra,* 311 N.W.2d at 185:

> "Those relationships which have been deemed sufficiently important to warrant a rule of privilege have been expressly delineated by rule, statute, and constitutional provision in this State. These provisions will be strictly construed to protect only those relationships which have been deemed to engender a public good which outweighs the principle that all rational means should be employed to ascertain the truth."

Balanced against this narrow interpretation of statutory privilege is the " 'cardinal rule' " of statutory construction, which requires that " 'the interpretation must be consistent with legislative intent and done in a manner which will accomplish the policy goals and objectives of the statutes.' " *Olson v. University of North Dakota,* 488 N.W.2d 386, 390 (N.D.

1992) (quoting *O'Fallon v. Pollard,* 427 N.W.2d 809, 811 (N.D.1988)); *see also* Section 1-02-01, N.D.C.C.; *In re C.J.A.,* 473 N.W.2d 439, 440 (N.D.1991). It is within this context of narrow construction, but always with an eye on the legislative purpose, that we interpret the statutory medical peer review privilege.

Trinity relies primarily upon caselaw from other states to support its argument for a broad reading of the privilege, to cover all hospital committees, departments, and individual employees performing medical review functions, and to protect all information or documents presented to them or created at their direction. However, because of the lack of uniformity among the various states' peer review privilege statutes, caselaw interpreting those statutes is not highly persuasive in our interpretation of Sections 23-01-02.1 and 31-08-01, N.D.C.C. It has been noted that "there is extremely wide variation in the privilege granted by the states," and that there is little consistency in the entities covered or types of information protected. Susan O. Scheutzow & Sylvia Lynn Gillis, *Confidentiality and Privilege of Peer Review Information: More Imagined Than Real,* 7 J.L. & Health 169, 186–187 (1992–1993); *see also* Ernest J. Naufel, Jr., *Physician Peer Review—Is it Really Confidential?,* 45 Fed'n Ins. & Corp. Couns. Q. 229, 229–230 (1995). As a result, the caselaw interpreting these widely varying statutes has been described as "creating a crazy quilt effect among the states." Scheutzow & Gillis, *supra,* 7 J.L. & Health at 188; *see also Naufel, supra,* 45 Fed'n Ins. & Corp. Couns. Q. at 230 ("There are as many different approaches to a resolution of this situation as there are appellate courts and legislatures."); Charles David Creech, *The Medical Review Committee Privilege: A Jurisdictional Survey,* 67 N.C.L.Rev. 179, 212 (1988). Thus, although nearly every state has some form of statutory privilege for medical peer review, it appears that no two statutes, or courts' interpretations of them, are alike.

Comparing the North Dakota statutory scheme with those of other jurisdictions, our statutory language creates a privilege much narrower than those in most other states. While our statutes cover only certain enumerated committees and only proceedings and records of those committees, some jurisdictions protect all committees which perform any quality assurance function and protect all information or data provided to or acquired by the committees. *Compare* Sections 23-01-02.1 and 31-08-01, N.D.C.C., *with, e.g.,* Ariz.Rev.Stat. Ann. §§ 36-445, 36-445.01; Cal. Bus. & Prof.Code § 805(a)(1) and Cal. Evid.Code § 1157; Colo.Rev.Stat. Ann. § 13-21-110; Ind.Code Ch. 34-4-12.6; Minn.Stat. Ann. §§ 145.61(5), 145.64; N.C. Gen.Stat. § 131E-95; S.C.Code Ann. §§ 40-71-10, 40-71-20.

■ We often look to interpretive caselaw of other states if our statute has been adopted from the other state's statute, or if both states have adopted a uniform law. *See, e.g., Jahner v. Jacob,* 515 N.W.2d 183, 184 (N.D.1994); *Estate of Zins by Kelsch v. Zins,* 420 N.W.2d 729, 731 (N.D.1988). However, even where another jurisdiction's law serves as the basis for our statute, we will not presumptively apply a similar construction if our legislature has made substantive changes in the statute:

> " 'In those instances, where material and substantive changes are made by the Legislature in adopting a federal statute the presumption that the Legislature intended to accomplish the same purposes and objectives as the Congress is no longer valid. Substantive changes can easily, and probably do, indicate different purposes and objectives than those intended by the Congress when it initially enacted the law.' "

*State v. Wells,* 276 N.W.2d 679, 691 (N.D.), *cert. denied,* 442 U.S. 932, 99 S.Ct. 2865, 61 L.Ed.2d 300 (1979), (quoting *State v. Wells,* 265 N.W.2d 239, 247 (N.D.1978) (Sand, J., concurring)). And where, as here, the various state laws on a subject "are known for the extent to which they vary from each other in both application and operation," caselaw interpreting these varied statutory schemes is of little persuasive authority. *Nesdahl Surveying & Engineering, P.C. v. Ackerland Corp.,* 507 N.W.2d 686, 690 (N.D. 1993).

Nevertheless, Trinity urges us to rely upon caselaw and statutes of other jurisdictions to

determine the public policy underpinnings of the peer review privilege. Trinity asserts that public policy supports a broad application of the privilege to cover the entire peer review process.

■■■■ While there may be valid policy concerns which support a broad peer review privilege, those are arguments for the legislature, not this court. *See, e.g., Little v. Graff,* 507 N.W.2d 55, 60 (N.D.1993); *Lembke v. Unke,* 171 N.W.2d 837, 853 (N.D.1969) ("it is for the legislature to determine policy, not for the courts"). The legislature has sifted through the competing policy concerns and adopted a statutory privilege. Our function is not to reevaluate those policy arguments, but to ascertain the legislature's intent from the language of the statute. *E.g., State v. Pippin,* 496 N.W.2d 50, 52 (N.D. 1993). We are not free to disregard the letter of the statute under the pretext of pursuing its spirit. *See* Section 1–02–05, N.D.C.C.; *In re Estate of Voeller,* 534 N.W.2d 24, 26 (N.D.1995).

■■■■ We must be particularly vigilant against extending the scope of the privilege beyond that warranted by the purpose expressed in the language of the statute. In this regard, we agree with the rationale expressed by the Supreme Court of Rhode Island in *Moretti v. Lowe,* 592 A.2d 855, 857–858 (R.I.1991):

> "In enacting our peer-review statute, the Legislature recognized the need for open discussions and candid self-analysis in peer-review meetings to ensure that medical care of high quality will be available to the public. That public purpose is not served, however, if the privilege created in the peer-review statute is applied beyond what was intended and what is necessary to accomplish the public purpose. The privilege must not be permitted to become a shield behind which a physician's incompetence, impairment, or institutional malfeasance resulting in medical malpractice can be hidden from parties who have suffered because of such incompetence, impairment, or malfeasance."

Accordingly, we determine the scope of the peer review privilege from the language of our statutes and the purpose that language was intended to achieve.

## A. COMMITTEES COVERED

Section 31–08–01, N.D.C.C., protects the records and proceedings of "any regularly constituted medical review committee of a licensed medical hospital." Section 23–01–02.1, N.D.C.C., covers "a mandatory hospital committee … as required by state or federal law or by the joint commission on accreditation of hospitals" or "an internal quality assurance review committee of any hospital." Keplin asserts that these statutes protect only committees mandated by law or the joint commission [JCAHO], and a single medical review/quality assurance committee of the medical staff. Trinity asserts that the statutes are not meant to limit coverage to specific committees, but are designed to protect the entire peer review/quality assurance *process* from disclosure. Trinity argues this protection extends beyond mandatory and quality assurance committees to any hospital committee performing any quality assurance function, to departments, and to individual hospital employees assigned to a quality assurance function.

The district court's order compelling discovery protected only Trinity's Quality Assurance Committee of the medical staff. The district court apparently determined that this committee was the "quality assurance review committee" specified in Section 23–01–02.1 and the "medical review committee" specified in Section 31–08–01. However, Keplin now concedes that the district court's order is too narrow, and that the Safety Committee, the Infection Control Committee, and the Medical Staff Executive Committee are mandated by JCAHO and are therefore included within the protections of Section 23–01–02.1, N.D.C.C.

Trinity argues that the privilege should also be extended to cover the entire quality assurance process, including other, non-mandatory hospital committees, and departments and individuals when performing quality assurance functions. Trinity asserts that the public policy underlying the peer review privilege, as expressed in caselaw and statutes from other jurisdictions, supports this broad protection. Trinity particularly relies upon

Minnesota law, asserting that testimony in the legislative history of Section 23–01–02.1, N.D.C.C., suggests a common policy basis for our statutes and the Minnesota statutes. Trinity quotes at length from the Minnesota statutes, and argues that we should interpret our statutes to provide the same broad protections.

■ The problem with Trinity's logic is that our legislature used much narrower language in drafting the statutory privilege than did the Minnesota legislature. Minnesota's statutes describe the committees covered according to their functions, including hospital committees which are established to "gather and review information relating to the care and treatment of patients for the purposes of" quality assurance. *See* Minn.Stat.Ann. § 145.61(5). Furthermore, the Minnesota privilege applies to "[a]ll data and information *acquired by*" such committees. Minn. Stat.Ann. § 145.64 (emphasis added). By contrast, our legislature has provided a privilege for certain enumerated committees, and, as addressed in the next section, only protects the "records and proceedings of" such committees. The Minnesota statutory language is significantly broader than Sections 23–01–02.1 and 31–08–01, N.D.C.C. If our legislature had intended to provide a broad statutory privilege for the entire quality assurance process, or for all committees performing any quality assurance function, it could have said so. The language employed in our statutes limits the privilege to committees mandated by law or the JCAHO standards, and to an internal quality assurance/medical review committee.

■ Our conclusion is further supported by the legislative histories of Sections 23–01–02.1 and 31–08–01, N.D.C.C., which demonstrate that the primary purpose of the peer review privilege was to encourage physician participation in the peer review process. Concerns were expressed that physicians would be unwilling to serve on quality assurance committees, and would not feel free to openly discuss the performance of other doctors practicing in the hospital, without assurance that their discussions in committee would be confidential and privileged. It was this purpose to encourage frank and open physician participation, and the resulting improvement in patient care, which underlies the privilege. The legislative history, however, does not address similar concerns for participation by departments, nurses, or other hospital employees.

Trinity also asserts that the Medical Staff Credentials Committee, which maintains files on each physician authorized to practice at the hospital, accumulates information on applicants for hospital privileges, and makes recommendations concerning the scope of each physician's practice at the hospital, should be protected as a "quality assurance," "medical review" committee under Sections 23–01–02.1 and 31–08–01, N.D.C.C. Although we have construed the statutes to protect only mandatory committees and a "quality assurance" or "medical review" committee, our interpretation of the statutes cannot be so strict as to limit their application by the name employed to describe the committee and to thereby contradict legislative intent. In essence, the Credentials Committee is really a specialized quality assurance committee, charged with assuring the competence of physicians authorized to practice at Trinity. It performs this function by maintaining files and reviewing the performance on each physician authorized to practice at Trinity. Furthermore, it is a committee of the medical staff, made up of physicians currently authorized to practice at Trinity. Thus, the concerns about, and the objective to assure, open and honest physician participation in the peer review process emphasized in the legislative history support application of the privilege to the Credentials Committee. We therefore agree with Trinity that the Credentials Committee is covered by the privilege.

We conclude, on this record, that the privilege applies only to the Medical Staff Quality Assurance Committee, the Safety Committee, the Infection Committee, the Medical Staff Executive Committee, and the Credentials Committee.

## B. INFORMATION PROTECTED

The parties also disagree about the types

of information protected by the privilege.[3] Our analysis begins with the language of the statutes. Section 31–08–01, N.D.C.C., protects the "records and proceedings of" medical review committees. The relevant portions of Section 23–01–02.1, N.D.C.C., say:

"Any information, data, reports, or records made available to a ... committee ... are confidential and may be used by such committees and the members thereof only in the exercise of the proper functions of the committees. The proceedings and records of such a committee are not subject to subpoena or discovery or introduction into evidence in any civil action arising out of any matter which is the subject of consideration by the committee."

Trinity asserts that, under Section 23–01–02.1, all information, data, reports, or records made available to protected committees are privileged. Keplin asserts the privilege is limited to "proceedings and records of" protected committees.

Trinity's argument is flawed by its misreading of Section 23–01–02.1. The first sentence of the statute provides that "[a]ny information, data, reports, or records made available to" a covered committee "are confidential." The second sentence specifies that "proceedings and records of such a commit-

tee are not subject to subpoena or discovery or introduction into evidence."

■■■ Trinity has confused confidentiality with privilege. It is the second sentence which creates the privilege. The first sentence merely provides that information made available to the committee is confidential, and "may be used by such committees and the members thereof only in the exercise of the proper functions of the committees." That provision is directed to those who acquire information in the course of serving on the committee, and directs that they are not free to disseminate such information to third persons or the public. Confidentiality, however, is not synonymous with privilege:

"Confidentiality and privilege are two compatible, yet distinct, concepts. Privilege addresses a person's right not to have another testify as to certain matters as part of a judicial process, while confidentiality addresses the obligation to refrain from disclosing information to third parties other than as part of legal process."

Scheutzow & Gillis, *supra*, 7 J.L. & Health at 192. We conclude that the privilege under Sections 23–01–02.1 and 31–08–01 applies only to the "proceedings and records of" covered committees.

---

**3.** Our review in this case is significantly hampered by Trinity's failure to provide the requested documents for an in camera inspection by the trial court. Trinity could have at least provided specific descriptions of the types of information, the sources of documents, and the specific committee or department which generated or collected the information. Instead, we have been presented with only vague, generic descriptions of the types of information Trinity claims are privileged. Blanket claims of privilege are not favored. *Ray v. St. John's Health Care Corp.*, 582 N.E.2d 464, 473 (Ind.Ct.App.1991).

Most of the courts which have directly addressed this issue have either required, or strongly encouraged, in camera review of the material for which the privilege is claimed. *See, e.g., Willits v. Superior Court*, 20 Cal.App.4th 90, 24 Cal.Rptr.2d 348, 357 (1993); *Menoski v. Shih*, 242 Ill.App.3d 117, 183 Ill.Dec. 907, 909–910, 612 N.E.2d 834, 836–837 (1993); *Ray, supra*, 582 N.E.2d at 474; *Wesley Medical Center v. Clark*, 234 Kan. 13, 669 P.2d 209, 220–221 (1983); *Southwest Community Health Services v. Smith*, 107 N.M. 196, 755 P.2d 40, 44 (1988); *Kavanaugh v. Perkins*, 838 S.W.2d 616, 620–621

(Tex.Ct.App.1992); *Young v. Saldanha*, 189 W.Va. 330, 431 S.E.2d 669, 672 (1993). Furthermore, the party claiming the privilege has the burden of proving that the material falls within the statutory privilege. *See, e.g., Willits, supra*, 24 Cal.Rptr.2d at 357; *Menoski, supra*, 183 Ill.Dec. at 909, 612 N.E.2d at 836; *Southwest Community Health Services, supra*, 755 P.2d at 44; *Kavanaugh, supra*, 838 S.W.2d at 619–620; *Young, supra*, 431 S.E.2d at 672; *see also State ex rel. Gullickson v. Gruchalla*, 467 N.W.2d 451, 455 (N.D.1991) (party claiming Fifth Amendment privilege has burden of establishing existence of privilege); *Stormon v. Weiss*, 65 N.W.2d 475, 520 (N.D.1954) (party claiming attorney-client privilege has burden of establishing existence of privilege). Because of Trinity's failure to provide a more precise record on this issue, we are left to deal with vague generalities when attempting to delineate the categories of information protected by the statutory privilege. We would strongly encourage future claimants of the privilege to provide a better record when attempting to meet their heavy burden of demonstrating that the materials sought to be protected fall within the statutory privilege.

■ Trinity argues that, even if the privilege applies only to proceedings and records, information provided to the committee and data collected by departments and hospital employees for review by the committee are included within "proceedings and records of" the committee. The statute, however, clearly distinguishes between "information, data, reports, or records made available" to the committee, and the "proceedings and records of" the committee. The former are merely confidential; the latter are privileged. The legislature has expressed its intent that the two categories of information be treated differently by separating them in the statute.

■ If the legislature had intended that all information provided to the committee be privileged, it would have expressly said so. It did not. The reading urged by Trinity would render the legislature's choice of language superfluous. Statutes must be read to give effect to all of their provisions, so that no part of the statute is inoperative or superfluous. Section 1–02–38(2), N.D.C.C.; *Regstad v. Steffes*, 448 N.W.2d 203, 206 (N.D. 1989); 2A Sutherland, Statutory Construction § 46.06 (5th ed.1992).

■ By employing the phrase "proceedings and records of" the committee in the second sentence, the legislature clearly meant something different than the phrase it used in the first sentence, "information, data" and "reports" made available to the committee. We construe the phrase "proceedings and records of" the committee to be limited to the formal proceedings before the committee, and the internal records generated by the committee. Specifically, this would include testimony given to the committee at a hearing, the deliberations and discussions among committee members, and the minutes of committee meetings. It does not include other information or data provided to the committee or collected for the committee's review by hospital departments or employees. It is the internal functioning of the committee which is protected.

We conclude that only the proceedings and records of covered committees are protected by the statutory privilege.

## IV. BUSINESS AND FINANCIAL RECORDS

Keplin asserts that Trinity has failed to provide corporate business and financial records pertaining to Trinity's establishment of a neurosurgical department, recruitment of Dr. De Naples, and performance of the contract between Dr. De Naples and Trinity. Keplin also asserts that some copies of records which have been provided by Trinity had material portions blacked out. Keplin asks that we order disclosure of the requested information and impose sanctions upon Trinity for its violation of the district court's order.

■ We have exercised our supervisory jurisdiction in this case for the limited purpose of reviewing Trinity's claim that it had been ordered to disclose privileged information and that it had no adequate alternative remedy. Trinity concedes that the privilege under Sections 23–01–02.1 and 31–08–01, N.D.C.C., does not apply to the business and financial records sought by Keplin. Thus, this issue is not properly before us. The district court is the proper forum in which to seek compliance with the discovery order and imposition of sanctions for violations.

## V. CONCLUSION

We have considered the remaining issues raised by the parties and they do not affect our decision.

We direct the district court to vacate its June 30, 1995 discovery order and to enter an order in accordance with this opinion. All parties shall bear their own costs for this proceeding.

VANDE WALLE, C.J., and NEUMANN, SANDSTROM and MESCHKE, JJ., concur.