Anton J. RIDL, Sadako Ridl, Eugene K. Ridl, Clarence R. Ridl, June Ridl, Grace I. Wetzel, Raymond A. Ridl and Regina A. Ridl, Plaintiffs and Appellants,

v.

EP OPERATING LIMITED PARTNERSHIP, Defendant and Appellee.

Civ. No. 960032.

Supreme Court of North Dakota.

Oct. 1, 1996.

---

Michael J. Maus of Howe, Hardy, Galloway & Maus, PC, Dickinson, for plaintiffs and appellants.

John L. Sherman of Mackoff, Kellogg, Kirby & Kloster, PC, Dickinson, for defendant and appellee.

SANDSTROM, Justice.

Anton J. Ridl, Sadako Ridl, Eugene K. Ridl, Clarence R. Ridl, June Ridl, Grace I. Wetzel, Raymond A. Ridl, and Regina A. Ridl (collectively referred to as Ridl)[1] appealed a district court judgment upholding a 1973 oil and gas lease held by EP Operating Limited Partnership (EP)[2] and dissolving a June 15, 1995, satisfaction of oil and gas lease recorded by Ridl in the office of the Stark County Register of Deeds. We affirm, concluding the failure to respond within 20 days

---

1. All of the plaintiffs acquired their interests from Anton A. Ridl and Eleanor Ridl.

2. The lease at issue is now owned by Enserch Exploration, Inc.

of notice did not terminate the lease, and termination of the lease required an appropriate demand and a failure to further develop within a reasonable time.

I

On March 19, 1969, Anton A. Ridl, Eleanor M. Ridl, Anton J. Ridl, Sadako Ridl, Raymond A. Ridl, and Regina A. Ridl gave an exclusive oil and gas lease on their land in Stark County—E½ SE 1/4 and NW 1/4 SE 1/4 of Section 23, and NW 1/4 and S½ (except 77.96 acres) of Section 24, Township 140 North, Range 96 West. The lease was for a primary term of five years and provided the following secondary term:

"and as long thereafter as oil or gas or casinghead gas of either or any of them, is produced therefrom; or as much longer thereafter as the lessee in good faith shall conduct drilling operations thereon and should production result from such operations, this lease shall remain in full force and effect as long as oil or gas or casinghead gas, shall be produced therefrom."

On March 15, 1973, the SE 1/4 of Section 23 was included in the Dickinson Heath Sand Unit. On December 20, 1973, Anton A. Ridl and Eleanor Ridl executed an exclusive oil and gas lease covering the land covered by the 1969 lease, for a primary term of five years, and "as long thereafter as oil, gas, distillate ... is produced hereunder, or any operation is conducted, any payment is made, or any condition exists, which as hereinafter provided continues this lease in force." Both leases provided for unitization and provided unitized production would be production under the lease.

On April 15, 1981, Anton A. Ridl and Eleanor Ridl ratified the 1973 lease. On May 12, 1981, EP's predecessor began drilling a well on the SW 1/4 NW 1/4 of Section 24 and completed it as a dry hole on June 2, 1981.

Relying on N.D.C.C. § 47–16–36, which outlines a procedure for creating record no-

tice of the termination or forfeiture of an oil, gas, or other mineral lease, and for the recording of a satisfaction of a lease,[3] Ridl's attorney sent EP a letter on May 25, 1995, requesting EP to release the 1973 lease, except for the acreage within the Dickinson Unit, a partial release for EP to sign, and a notice of termination of the 1973 lease. The notice of termination stated the lease was "forfeited and void" unless EP "within twenty (20) days from this date, notify the Register of Deeds of said county ... that said lease has not been forfeited" and demanded EP execute and record a proper surrender of the lease. The letter and enclosures were delivered to EP on May 31, 1995. They were received by EP's legal department on June 15, 1995.

On June 15, 1995, Ridl recorded with the Register of Deeds a Satisfaction of Oil and Gas Lease reciting that the 1973 lease, except for the land in the Dickinson Unit, was forfeited, and also recorded a notice of termination of the 1973 lease, except for the land in the Dickinson Unit. On June 16, 1995, EP sent letters to Ridl's attorney and the Register of Deeds, asserting that the 1973 lease was not forfeited but in full force and effect. On July 5, 1995, EP recorded with the Register of Deeds a notice of oil and gas lease declaring the 1973 lease "has been held in full force and effect by continuous production from the Dickinson Field Heath Sand Unit" and "remains in full force and effect as to all of the acreage originally covered thereby."

By complaint of August 8, 1995, Ridl sued EP for cancellation of the 1973 lease for failure to timely respond to the notice of termination or breach of the implied covenant of reasonable development. EP answered and counterclaimed. Ridl and EP both filed motions for summary judgment. The district court granted EP's motion for summary judgment. The judgment entered decreed: (1) "That EP Operating Limited Partnership, its successors and assigns, are the owners of a valid and subsisting Oil and

---

**3.** This court has previously referred to N.D.C.C. § 47–16–36. *See Nygaard v. Robinson,* 341 N.W.2d 349, 358 (N.D.1983) (Section 47–16–36 "specifies a procedure in which recorded oil, gas, and other mineral leases can be removed from the record by the lessor without a judicial

determination."); *Taurus Corp. v. Roman Yourk Equity Pure Trust,* 264 N.W.2d 688, 689 (N.D. 1978) (Section 47–16–36 "basically establishes a procedure in which recorded oil, gas and other mineral leases can, in effect, be removed from the record by the lessor.").

Gas Lease dated December 20, 1973," (2) that the June 15, 1995, Satisfaction of Oil and Gas Lease recorded in the office of the Register of Deeds "is in all things void and the same is hereby in all things dissolved, vacated and purged from the records of said Register of Deeds," and (3) "That no issue exists in this litigation concerning an Oil and Gas Lease dated March 19, 1969." [4]

The district court had jurisdiction under N.D. Const. Art. VI, § 8, and N.D.C.C. § 27–05–06. The appeal was timely under N.D.R.App.P. 4(a). This Court has jurisdiction under N.D. Const. Art. VI, § 2, and N.D.C.C. § 27–02–04.

## II

■ Ridl contends any interest EP had in the 1973 lease terminated when it failed to respond within twenty days of Ridl's notice under N.D.C.C. § 47–16–36.

■ Ridl mailed to EP a notice of termination of the 1973 lease on May 25, 1995. EP did not respond until June 16, 1995, twenty-two days later. However, N.D.C.C. § 47–16–36 does not provide a lessee's failure to respond within twenty days to an owner's notice of termination results in the lessee losing all its property interests in the lease. The only consequence provided by N.D.C.C. § 47–16–36 for a lessee's failure within twenty days of being served with a notice of termination to notify the Register of Deeds the lease has not been forfeited and is in full force and effect, is a loss of record evidence:

"If the lessee, his successors or assigns, shall not notify the register of deeds, as above provided, then the register of deeds shall record said satisfaction of lease and thereafter the record of the said lease shall not be notice to the public of the existence of said lease or of any interest therein, or rights thereunder, and said record shall not be received in evidence in any court of the state on behalf of the lessee, his successors or assigns, against the lessor, his successors or assigns."

Furthermore, N.D.C.C. § 47–16–37 provides in part: "Should the owner of such lease neglect or refuse to execute a release, then the owner of the leased premises may sue in any court of competent jurisdiction to obtain such release." Acceptance of Ridl's argument that a lessee's failure to respond within twenty days to a notice of termination automatically results in the lessee's loss of any interest in the lease would render N.D.C.C. § 47–16–37 giving the owner of the leased premises the right to sue for a release, superfluous. "Statutes must be read to give effect to all of their provisions, so that no part of the statute is inoperative or superfluous." *Trinity Medical Center, Inc. v. Holum,* 544 N.W.2d 148, 157 (N.D.1996). "A statute must be construed as a whole to determine the legislative intent, and if possible, the entire statute must be given meaning because the law neither does nor requires idle acts." *State ex rel. Kusler v. Sinner,* 491 N.W.2d 382, 385 (N.D.1992). We conclude EP did not lose its interest in the 1973 lease when it failed to respond within twenty days of Ridl's notice of termination of the lease.

Ridl's reliance on *Taurus,* note 3, is misplaced. On January 6, 1951, the Supreme Court of Kansas issued an opinion construing G.S.1935, 55–201 (now K.S.A. § 55–201). *Christiansen v. Virginia Drilling Co.,* 170 Kan. 355, 226 P.2d 263 (1951). The Kansas Supreme Court held "[t]here can be no breach of an implied covenant in a lease until there has been a judicial determination thereof," 226 P.2d at 267, and "[t]he legislature in enacting G.S.1935, 55–201 did not intend to endow the lessor of an oil and gas lease with the power to arbitrarily forfeit a lease in whole or in part for violation of an implied covenant therein," *Christiansen* at 268. Kansas G.S.1935, 55–201 and 55–202 (now K.S.A. §§ 55–201 and 55–202) were virtually identical to N.D.S.L.1951, Ch. 233, §§ 1 and 2, which were contained in S.B. 85 introduced on January 10, 1951, enacted on March 7, 1951, and are now codified as N.D.C.C. §§ 47–16–36 and 47–16–37. *Taurus* involved a lease for which it was alleged

---

4. The 1969 lease may well have merged with the 1973 lease. *See, e.g., First Nat'l Bank v. O'Callaghan,* 143 N.W.2d 104 (N.D.1966); 17A Am. Jur.2d, *Contracts* § 542 (1991); John D. Cala-

mari and Joseph M. Perrillo, *Contracts* § 21.13 (3d ed.1987); 6A Richard R. Powell and Patrick J. Rohan, *Powell on Real Property,* ¶ 901[1][d] (1996).

the lessee failed to pay any consideration. On the issue of whether or not a judicial determination that a lease is terminated or forfeited is necessary before proceeding under N.D.C.C. § 47–16–36, the *Taurus* court, without explanation, rejected the majority opinion in *Christiansen*, approved the dissenting opinion in *Christiansen*, and affirmed a district court judgment holding the lessee lost its interest in the real estate by failing to respond to a § 47–16–36 notice within twenty days. The majority opinion in *Christiansen* was based upon the view that forfeiture statutes should be strictly construed in favor of a person whose property is sought to be forfeited. That view is represented in such North Dakota decisions as *Nelson v. TMH, Inc.*, 292 N.W.2d 580, 584 (N.D.1980) (equity abhors forfeitures), and *Johnson v. Gray*, 265 N.W.2d 861, 864 (N.D.1978) (the law abhors forfeitures). The dissenting opinion in *Christiansen*, that the statute was enacted to allow a landowner to clear a cloud on his title without a judicial determination when he claims a lease has become forfeited, was an over-expansive reading of legislative intent in light of the statutory language. Upon reconsidering *Taurus* in light of the language we have quoted from N.D.C.C. § 47–16–36, the language in N.D.C.C. § 47–16–37, and the gloss placed on virtually identical Kansas legislation by the Kansas Supreme Court before our legislature enacted N.D.C.C. §§ 47–16–36 and 47–16–37, we decline to extend it to cases involving alleged breaches of implied covenants.

### III

■ Ridl contends the district court erred in granting summary judgment for EP on the ground Ridl had not made an appropriate demand for performance of the implied covenant of reasonable development.

■ " '[W]hether or not there has been reasonable development of a leasehold is determined by reference to the "prudent operator" standard.' " *Johnson v. Hamill*, 392 N.W.2d 55, 58 (N.D.1986) (quoting *Olson v.*

*Schwartz*, 345 N.W.2d 33, 39 (N.D.1984)). Whether or not one's conduct has met the standard of the prudent operator is a question of fact. *Johnson* at 58. "[B]efore a court of equity will grant a forfeiture the lessor must first give notice of the breach and demand that the terms of the implied covenant be complied with within a reasonable time." *Olson* at 40.

Ridl contends R.E. Moore made a demand for further development in a 1976 letter to EP requesting EP to either drill a well on the Ridl land or release the lease. When EP responded that the lease was held by production under the Dickinson Heath Unit[5] and refused to release the lease, as Moore said in his affidavit, "the matter was dropped at that time." In 1981 Ridl ratified the 1973 lease. Whatever effect Moore's letter may have had expired at least by the time Ridl ratified the 1973 lease in 1981 and a well was drilled on the Ridl land in 1981.

■ Ridl also asserts more recent demands for further development:

"Implied demand was again made in the May 25, 1995 letter of Attorney Maus. It was also made in the Complaint which was filed in this action. The Defendant has never, even after the service of the Complaint in this action, revealed any intention to proceed with development of the Ridl lease."

Maus' May 25, 1995, letter to EP requested EP to release the lease and was accompanied by a notice of termination of the lease. One cannot reasonably infer from either the letter or the complaint a demand that EP further develop the leasehold. Rather than implying a demand for further development, the letter and the complaint implicitly warn against further development:

" 'Acts by the lessor that justify the suspension of operations by the lessee and excuse his performance of implied covenants include:

\*     \*     \*     \*     \*     \*

---

5. Paragraph 7 of the 1973 lease authorizes the lessee to unitize the leased premises and provided: "Operations upon and production from the unit shall be treated as if such operations were

upon or such production were from the leased premises whether or not the well or wells are located thereon."

" '(2) declaration by lessor that the lease has terminated, has been forfeited, or cancelled;

\* \* \* \* \* \*

" '(4) filing of suit to cancel, forfeit, or declare the lease terminated.' "

*Johnson*, 392 N.W.2d at 60–1 (quoting 5 H. Williams and C. Meyers, *Oil and Gas Law* § 808, pp. 52–3 (1985)). Furthermore, none of Ridl's "demands" complies with Paragraph 10 of the 1973 lease dealing with a lessee's failure to comply with its obligations.[6] We conclude the trial court properly ruled Ridl has not made an appropriate demand that the terms of the implied covenant of further development be complied with within a reasonable time.

## IV

Ridl contends the district court erred in ruling the 1973 lease does not require production in paying quantities. Ridl acknowledged in their brief the court's ruling "may be of no further significance in this case if this Court upholds the Trial Court's granting of the Defendant's Motion for Summary Judgment," but contends "the Court should not have entered a dispositive ruling on this issue." Ridl moved to amend the complaint to assert a claim the lease should be terminated because oil and gas is not being produced in paying quantities. Ridl asserts in their brief: "Plaintiffs agreed at the hearing that if summary judgment was granted to either party, the motion would be withdrawn." In its conclusions of law, the district court said it considered Ridl's motion to amend the complaint "to have been withdrawn." The court ruled on the issue only "[i]n the event it is claimed that the motion was not withdrawn." The transcript of the hearing shows that Ridl's attorney said: "The plaintiff's motion to amend should only be granted if both motions [for summary judgment] are denied and the case is going to proceed." Clearly, Ridl has withdrawn the motion to amend or abandoned any claim that the motion was not withdrawn. The court's ruling on this issue is, therefore, of no consequence, and we need not further address it. It is also of "no further significance in this case" because we are upholding the trial court's granting of summary judgment.

## V

The judgment of the district court is affirmed.

VANDE WALLE, C.J., and NEUMANN and MARING, JJ., concur.

MESCHKE, Justice, dissenting.

I respectfully dissent. The majority reconsiders and refuses to follow *Taurus Corp. v. Roman Yourk Equity Pure Trust*, 264 N.W.2d 688, 689 (N.D.1978), thus depriving oil and gas lessors of an important tool that encourages development, instead of "warehousing," of oil resources in this state.[1] This decision afflicts oil and gas lessors in a way comparable to the debilitating process in aging humans that causes loss of skeletal muscle, known as sarcopenia ("vanishing flesh"). The process here is a form of legal sarcope-

---

6. "10. In the event Lessor considers that Lessee has failed to comply with any obligation hereunder, express or implied, Lessor shall notify Lessee in writing specifying in what respects Lessor claims Lessee has breached this lease. The service of such notice and the lapse of sixty days without Lessee's meeting or commencing to meet the alleged breaches shall be a condition precedent to any action by Lessor for any cause. If within sixty days after receipt of such notice Lessee shall meet or commence to meet the breaches alleged by Lessor, Lessee shall not be deemed in default hereunder. The breach by Lessee of any obligation hereunder shall not work a forfeiture or termination, in whole or in part, of this lease."

1. The length of time that exploratory drilling has been delayed is material not only to the reasonableness of the lessee's conduct but to the degree of harm suffered by the lessor. The longer the lessee has delayed exploratory drilling, the greater the harm to the lessor. Thus, leases have been cancelled as to untested acreage, without proof that further drilling would probably be profitable, where the lessee had failed to drill for a prolonged period. These unreasonable periods of time have ranged from 35 years, 25 to 30 years, 26 years, 20 years, 17 years, 14 years, 13 years, 12 years, 11 years, and 10 years, down to five years, three years, two years, fourteen months, and finally to as few as five months.

2 Williams & Meyers, *Oil and Gas Law*, § 843.1, pp. 287–88 (1995) (footnotes omitted).

nia—a loss of legal muscle for mineral owners in the oil fields.

In *Taurus*, 264 N.W.2d at 693, this court held "the reasoning of the dissenting justices more convincing than that of the majority in *Christiansen* [*v. Virginia Drilling Co.*, 170 Kan. 355, 226 P.2d 263 (Kan.1951)]," the Kansas precedent interpreting the forerunner of our statutory procedure. The *Taurus* court explained why:

> Section 47–16–36, N.D.C.C., would serve little purpose if a lessor were required to secure a judicial determination that the lease was forfeited or terminated before utilizing the statute. The legislature, in enacting Section 47–16–36, N.D.C.C., attempted to establish a simple method in which landowners could remove a cloud from their title without the necessity of going into court. If the lessee disputes the termination or forfeiture of the lease, the lessee may force the lessor to secure a judicial determination of the issue by giving notice to the register of deeds within the required time.

*Id.* Justice Pederson added in a separate concurrence:

> It is not necessary that § 47–16–36, NDCC, be invalidated. There is merit in providing landowners the protection afforded by this statute, especially when they are "actively solicited and canvassed" by shrewd "entrepreneurs." *See Reiss v. Rummel*, 232 N.W.2d 40, 43 (N.D.1975). But, as in the case of actions to quiet title, there is room for an escape hatch to prevent unconscionable results. Section 32–17–13, NDCC, permits, on such terms as

are just, defenses to be heard even though there has been a default.

*Id.* Today, the court dissipates this *Taurus* precedent.

Because I disagree with this dissipation of the *Taurus* precedent, I have great difficulty in understanding how the majority can disregard the plain direction of NDCC 47–16–36 ("thereafter the record of the said lease shall not be notice to the public of the existence of said lease") in affirming a summary judgment that EP's failure to respond within 20 days of notice did not terminate the lease, and that "dissolved, vacated and purged from the records of said Register of Deeds" the statutory cancellation so as to reinstate the record of this Oil and Gas Lease.[2]

The majority believes NDCC 43–16–36 works an automatic forfeiture by EP, but the cancellation of a lease under the statute cannot possibly be called an automatic forfeiture. To obtain this form of cancellation of the lease, the landowners must strictly follow the procedure prescribed by the statute. Under it, the lessee has full right to compel a judicial determination of the question whether the lease has been actually forfeited.[3] The statute specifically grants the lessee the right simply to deny the lease has been forfeited and, when the lessee does so by a timely filing with the register of deeds, no cancellation of record results and the landowner is relegated to the remedy of an action in court to establish the forfeiture of the lease by proof. Such a procedure does not create an automatic forfeiture.

In a prior decision, this court recognized the propriety of this procedure in a dispute

---

2. The majority's footnote 4 also gratuitously suggests "[t]he 1969 lease may well have merged with the 1973 lease." But EP carefully explained the leases are still separate:

> The premises described in the lease are now and at all times since December 20, 1973, have also been subject to a March 19, 1969 Oil and Gas Lease granted by the parents of Plaintiffs Ridl. This 1969 lease is *NOT* in controversy in this action. A portion of the lands which are the subject of this action have been unitized and included as a part of the Dickinson Heath Sand Unit and have been producing at all times since March 15, 1973. Notwithstanding this production, the predecessor in interest of EP Operating in mistaken belief that the prop-

erty was unleased paid Ridls' parents approximately $11,000 for the December 20, 1973 Oil and Gas Lease. It is this 1973 Oil and Gas Lease Ridls seek to cancel in part.

Neither side gave a satisfactory explanation for the furor over this redundant lease, but there was no suggestion by either side of an intent to merge the leases, a necessary predicate for merger, and certainly a question of fact that could not be resolved by summary judgment on this record.

3. Certainly, twenty days is not an unreasonable period of time for the legislature to require a response. *See* NDRCivP 12(a) ("A defendant who is served with a summons shall serve an answer thereto within 20 days after service of the summons ...").

over the breach of an implied covenant of further development:

> By letters of January 5, 1982, to the lessees, the lessors asserted expiration of the primary term of the lease and requested release of the lease except for the NW1/4 SE1/4 of Section 25. On February 3, 1982, the lessors served upon the lessees notice, pursuant to § 47–16–36, N.D.C.C., that the lease (except for the NW1/4SE1/4 in Section 25) "has terminated or become forfeited by breach of the terms hereof" and demanded a surrender of the lease. The lessees responded as required by statute. By letters of June 7, 1982, the lessors demanded of the lessees "that you comply with the implied covenant to further develop the balance of the property not included in the production unit. In the alternative, please release the property not included in the production unit."

> By summons and complaint filed in the district court on January 25, 1983, the lessors sought a judgment decreeing "that the lease has terminated as to those portions of the leased property lying outside the existing governmental spacing unit," or, in the alternative, decreeing "that Defendants comply with the duties to reasonably develop and further explore the leased property within a time set by the Court or file a release of record."

*Johnson v. Hamill,* 392 N.W.2d 55, 56 (N.D. 1986). That case resulted in a decision favorable to the oil and gas lessee. Thus, the majority's refusal to apply *Taurus* in this case makes a critical and drastic change in a well-established relationship between oil and gas lessors and lessees in this state. All that EP had to do to preserve its record position and to contest this cancellation was to respond timely to the Ridls' statutory notice.

I disagree with the majority's view that cancellation of a lease on the ground it has become forfeited for violation of an implied covenant to explore and develop can be obtained only by judicial action. As Justice Wedell thoughtfully explained in the Kansas dissent adopted in *Taurus, Christiansen,* 226 P.2d at 269, this statute was enacted to provide an inexpensive and prompt method for a landowner to clear the cloud on the title to

his minerals of a lease that *he claims* has become forfeited. The statutory procedure enables the landowner to obtain such a cancellation under the statute only if the lessee does not dispute the landowner's claim of forfeiture. To refuse to apply the statute to a lease where forfeiture is disputed, either by its express terms or otherwise, and to hold that it applies only to a lease that has become forfeit on its face as a matter of law or by judicial decree, emasculates the statute.

Obviously, if a lease has been canceled by judicial decree, there is no need for the statute. To be effective, the statute must include leases where forfeiture is disputed. Otherwise, the statute is meaningless and worthless.

What is more, the statute itself says it applies to leases where the question of forfeiture is in dispute. In detailing what the landowner may do if the lessee denies the forfeiture by giving timely notice in writing to the register of deeds "that said lessee ... still claim that said lease is in full force and effect," the statute directs,

> then the said satisfaction of lease shall not be recorded but the register of deeds shall notify the owner of the real property of the action of the lessee, his successors or assigns, and the owner of the real property shall be entitled to the remedies now provided by law for the cancellation of such disputed lease.

NDCC 47–16–36 (part). There is no basis in the language of this statute for excluding from its operation a forfeiture resulting from a violation of an implied covenant. The statute does not make such a distinction, and courts are not authorized to legislate by reading exceptions into a statute that are not there. The statute applies to leases that "shall terminate or become forfeit." Absent some restrictive language, that means forfeited for any reason.

We should not be concerned with the wisdom of this cancellation statute. That is a legislative province. In my opinion, the statute was intended to be operative in this

situation. Therefore, I respectfully dissent from the majority's gutting of the statute.

I would reverse the summary judgment.