02-08-453-CV















 
 
 
 
 
 
 




 

 

 

 

 

 

                                                COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                              NO.  02-08-00453-CV

 

 

VINSON MINERALS,
LTD.,                                                              APPELLANTS

JOHNNY
H. VINSON AND 

CHISHOLM 2000, L.P.

 

                                                             V.

 

XTO
ENERGY, INC.                                                                             APPELLEE

 

                                                       ------------

 

                  FROM
THE 271ST DISTRICT COURT OF WISE COUNTY

 

                                                       ------------

 

                                                      OPINION

 

                                                       ------------

I. 
INTRODUCTION

Appellants
Vinson Minerals, Ltd., Johnny H. Vinson, and Chisholm 2000, L.P. (the Vinsons) and Appellee XTO Energy,
Inc. (XTO) filed cross-motions for summary judgment
on the Vinsons=
claims relating to ten oil and gas leases covering the Vinsons=
ranch in Wise County, Texas.  The trial
court granted XTO=s
motion and denied the Vinsons=
motion.  The Vinsons,
as one or more of the lessors in each of the leases,
contend that they are entitled to terminate the leases with XTO,
as successor lessee, because XTO failed to make Aundisputed
payments@
after demand.  Because we hold that the Vinsons presented no evidence that they provided XTO with a proper written notice or demand for payment as
required by the leases, we affirm.

II.  BACKGROUND

The
oil and gas leases at issue originated in 2001 between Johnny Vinson, Vinson
Minerals, Ltd., and others as lessors and Threshold
Development Company as lessee.  Threshold is a Vinson family company in that
the owners, officers, and directors are members of the Vinson family.  In 2003, Antero Resources Corporation bought
Threshold=s
interests as lessee in the leases for $25 million.

In
early 2005, the Vinsons began disputing Antero=s
calculations of royalty payments to the Vinsons from
2003 to 2005 and commenced an audit of Antero=s
accounting records of royalties.  By
letter of January 25, 2005, the Vinsons informed
Antero that they were Awaiting on requested
information to complete [the] audit of production and royalty payments@ and
that the Vinsons= Apotential
claim@ for
royalty underpayment was $2 million.  In
March 2005, the Vinsons provided Antero with audit
exceptions listing, among other complaints, improper deductions from royalty
payments for compression, fuel, treating, and transportation charges by an Aaffiliated@
pipeline owned by Antero Ato be determined@ but
Aestimated
. . . to be in the range of $600,000.@[1]

The
relationship between the parties deteriorated as the Vinsons
raised other issues, including claims for reassignment of undeveloped acreage,
drill site issues, and road and surface damage issues.  On July 11, 2005, the Vinsons
filed suit against Antero for numerous claimsCincluding
trespass, breach of contract, incorrect calculation and underpayment of
royalties and other production costs, surface damages, and failure to developCseeking
an unspecified amount of damages and attorney fees.

In
the meantime, two months before the Vinsons filed
suit, XTO acquired Antero and the leases.  XTO was made aware
of the outstanding issues claimed by the Vinsons at
the time it acquired the leases.  In
March 2005, the Vinsons faxed XTO
a copy of its January 25 letter to Antero regarding the status of their
claims.  By letter dated August 5, 2005, XTO=s outside litigation counsel
initiated settlement dialogue with the Vinsons=
counsel, requesting that the Vinsons (1) amend their
pleadings to substitute XTO as the sole defendant,
(2) agree to suspend their ongoing audit during litigation, and (3) consider
opening discussions with XTO Ato
see if some or all of these issues can be resolved, and good working relations
restored, before pursuing litigation aggressively.@[2]

In a
January 18, 2006 letter to the Vinsons=
counsel, confirming delivery of documents in response to discovery, XTO=s counsel reaffirmed its Aintention
to resolve the royalty payment issues both prospectively and [as] to past
months, by an agreed method of changed payment and a lump sum settlement for
past months once the new payment method is agreed upon.@  A few days later, XTO=s
and the Vinsons=
accountants and legal counsel met to discuss settlement of all issues in the
suit, including the issue of the new methodology to be agreed upon in order to
recalculate the disputed royalties. 
Under the methodology proposed by XTO, its Aestimated@
preliminary calculation of royalty payments owed to the Vinsons
for the period from November 2003 through April 2005 (the Antero period)
totaled $643,548.19.  XTO
described this number as an estimate, subject to adjustment as XTO continued reviewing Antero=s
boxes of accounting records.[3]  The Vinsons and XTO agreed at this meeting to continue working, without the
presence of legal counsel, on the changed methodology to recalculate the
disputed royalty payments owed to the Vinsons during
both the Antero period and the period after May 2005, when XTO
acquired Antero (the XTO period).  In this regard, the parties obtained a Rule
408 Agreed Protective Order from the trial court that included a provision for
informal meetings of representatives of the parties to discuss royalty
accounting issues.[4]

On
March 16, 2006, XTO=s
counsel wrote the Vinsons=
counsel, summarizing the current status of the ongoing settlement discussions
on all issues and proposing that XTO recalculate all
prior royalties under a revised methodology and format and Ain
due course, make a retroactive payment to bring all prior periods up to the new
payment methodology.@  The letter requested that the Vinsons present a settlement demand Ato
resolve all issues in the case@ as
follows:

Please
discuss these issues with your client and present XTO
a settlement demand to resolve all issues in the case.  If we have misunderstood your
pleading in any respect, or if you would need to discuss any of these issues
prior to submitting a demand, please call me at your convenience.

 

 








On
May 12, 2006, the Vinsons=
counsel responded with a three-page letter faxed to XTO=s
counsel (the May 12 letter).  The letter
began with the following paragraph: 

In
response to your March 16, 2006, letter regarding possible settlement of this
matter, [the Vinsons have] been thoroughly engaged in
reviewing all of the information available related to this dispute.  Now that this review is complete [the Vinsons are] prepared to respond in full to your suggestion
as to Awhat XTO might offer to attempt to resolve the rest of the
claims in the lawsuit.@

 

In the May 12 letter, the Vinsons= counsel
characterized their claims as falling into two major categories, summarized as Asurface/lessor issues@ and Aworking interest/reassignment issues,@  with four main causes of action.  He discussed those issues in detail,
including the following:

Royalty/Accounting Issues.  If XTO makes a
retroactive payment as represented, including interest and attorney fees, and
revises the format for making future payments then this issue should be
resolved.  Until agreement on each of
these matters is reached, in accordance with the terms of [the Vinson] leases .
. . demand is hereby made for all undisputed payments due under the Wise County
leases.  As a part of any settlement of
this issue XTO will also have to confirm that it will
provide [the Vinsons] with daily production
information . . . . 

 

The letter concluded with
the following paragraph:

Considering
each of these factors, [the Vinsons] conservatively believe[ ]this case has a value greatly in excess of
$30,000,000.  Recognizing the risks of
litigation and the costs associated therewith, I have been authorized to settle
all claims in exchange for a payment in the amount of $9,500,000 and XTO bringing itself into compliance with the Barnett Shale
Project Agreement by signing JOA=s correctly
identifying Threshold=s before and after
payout working interests after XTO acquired Sinclair
Oil Corporation=s interest in said
agreement, in the same manner as all previously executed JOA=s.

 

 








On
May 25, 2006, XTO paid the Vinsons
the amount of $103,047.68, representing underpayments for royalties owed for
the XTO period, and using the new methodology that
had been discussed.[5]  The Vinsons
accepted that payment.  XTO then began using the new methodology to adjust the
royalty calculations previously made by Antero from the 348 boxes of accounting
documents, which were incompatible with XTO=s
computer system, in order to calculate amounts to be paid for the Antero
period.[6]

Sixty
days after sending the May 12 letter, the Vinsons
filed an amended petition substituting XTO as the
defendant.  In addition to the claims for
damages previously asserted, the Vinsons alleged that
XTO was in breach of contract by failing to make Aundisputed
royalty payments@ demanded by the Vinsons in the May 12 letter.  By the new pleading, the Vinsons
added a request for a declaratory judgment seeking termination of the leases
under the following portion of Section 3 (entitled ARoyalty
Payment@) of
the leases:[7]

3.  Royalty Payment.  Royalties on oil, gas, and other
substances produced and saved hereunder shall be paid by [XTO]
to [the Vinsons] as follows: . . .

 

e. . . . If [XTO] wrongfully or unreasonably withholds any undisputed
payment or payments due to [the Vinsons] for a period
of sixty (60) days after written demand for payment is made by [the Vinsons] on [XTO at the above
address (or such other address as may be specified in writing hereafter by XTO)], at the election of [the Vinsons]
this lease may be terminated.  The
foregoing sentence shall not apply to payments withheld by [XTO]
because [XTO] contests such payments in good faith so
long as [XTO] has timely paid to lessor
all undisputed payments due to [the Vinsons].[8]

 

On
October 16, 2006, the Vinsons filed a partial motion
for summary judgment asking the trial court to declare the leases terminated
under Section 3(e) of the leases because of XTO=s
failure to comply with the Vinsons=
alleged May 12 demand that Aall
undisputed amounts@ be paid within sixty days.[9]

On
November 1, 2006, XTO paid the Vinsons
$725,942Cthe Aestimated@
amount of $643,548.19 in royalty underpayments during the Antero period for
improper transportation charges on the Antero affiliated pipeline, plus $61,006
in interest and $21,387 in surface damages. 
XTO made subsequent payments of $16,972.79 and
$2,380.82 to the Vinsons later in November 2006 as
further adjustments for the underpaid amounts by Antero, as well as $150,000 in
attorney=s
fees.  After a hearing, the trial court
denied the Vinsons=
motion for partial summary judgment. 
Eventually, the parties settled all other claims and issues, with the Vinsons reserving their right to pursue the lease
forfeiture claim.

XTO
then filed a motion to exclude the May 12 letter under Texas Rule of Evidence
408, together with a motion for no-evidence summary judgment. XTO=s no-evidence summary
judgment motion asserted that the Vinsons had no
evidence

(1)
that it fully and sufficiently described in writing
the alleged breach or default and properly notified XTO
of the forfeiture to result from said breach;

 

(2)
that undisputed royalty payments were due and owing
under the Leases;

 

(3)
that undisputed payments were withheld in bad faith;
and

 

(4)
that undisputed payments were wrongfully or
unreasonably withheld.

 

 








The Vinsons responded to XTO=s
motion and also requested that the court reconsider their motion for partial
summary judgment.  The trial court granted
XTO=s
motions to exclude and for summary judgment without specifying the grounds
relied on, denied the Vinsons=
motion for reconsideration, and dismissed the Vinsons=
case with prejudice.  This appeal
followed.

III.  ISSUES

On
appeal, the Vinsons raise three issues.  First, they contend that the trial court
erred by denying their motion for summary judgment and granting XTO=s motion for summary
judgment because the Vinsons made written demand for
payment of undisputed sums in the May 12 letter, XTO
failed to pay those sums within sixty days, and the leases expressly provide
that they may be terminated if Aundisputed@
sums are not paid within sixty days of written demand.  Second, the Vinsons
assert that the trial court abused its discretion by excluding from evidence
the May 12 letter, which they contend was their Awritten
demand@
pursuant to the terms of the leases. 
Third, the Vinsons argue that the trial court
erred by excusing XTO from complying with the leases
and by applying the doctrine of disproportionate forfeiture.

XTO
responds that the trial court correctly excluded the May 12 letter from
evidence and that the trial court correctly granted its summary judgment motion
because the Vinsons produced no evidence of a proper
demand, no evidence that unpaid royalties were Aundisputed,@ no
evidence that amounts claimed were Awrongfully
or unreasonably@ withheld, and no evidence
that the Vinsons gave proper notice Afully
describing@ any
breach or default by XTO as required by the leases
for forfeiture.  XTO
further asserts that the Vinsons were made whole by
the payments they accepted, which foreclosed any election to sue for forfeiture
of the leases.

IV.  ANALYSIS

At
the core of the Vinsons=
appeal is their complaint that the trial court abused its discretion by
excluding from evidence and refusing to consider the May 12 letter, which the Vinsons characterize as their ADemand
Letter.@  The Vinsons contend
that the May 12 letter was admissible and was a proper written demand that met
the requirements of Section 3(e) of the leases. 
We will first consider whether the trial court abused its discretion by
excluding the May 12 letter from evidence.

A.  The May 12 Letter
Was Not a ADemand Letter.@

The Vinsons argue that the trial court abused its discretion by
excluding the May 12 letter from evidence under Texas Rule of Evidence 408 as a
compromise offer because the letter was not a compromise settlement demand but
was clearly a ADemand
Letter@
notifying XTO of its obligation to pay an amount that
XTO knew it owed but was withholding until all issues
could be resolved.  The Vinsons point out that the letter contained wording from
Section 3(e) of the leases making Ademand
. . . for all undisputed payments due@ and
that it expressly referred to the Wise County leases, which was, according to
the Vinsons, sufficient language to put XTO on notice that the leases gave it sixty days to respond
in order to defeat forfeiture of the leases. 
Thus, the Vinsons argue that the letter was
admissible as evidence of a demand.  XTO replies that the language of the letter is couched as a
global settlement demand offering to compromise all issues in the case for a
total specific amount (the only amount demanded in the letter); that the amount
owed for royalties was disputed; that if the Vinsons
intended a demand for payment in the letter, it was not recognized as such by XTO=s forty-year veteran oil and
gas litigation attorney; and that the alleged demand was misleading and
surreptitious with no specified amount to cure a default and did not specify a
time within which to pay but, instead, indicated it would remain open until
settlement.  Thus, XTO
argues the May 12 letter was properly excluded by the trial court.

Offers
of settlement are not admissible to prove liability or invalidity of a claim or
its amount.  Tex. R. Evid. 408; Ford Motor Co. v. Leggat,
904 S.W.2d 643, 649 (Tex. 1995) (orig. proceeding); Tatum
v. Progressive Polymers, Inc., 881 S.W.2d 835,
837 (Tex. App.CTyler
1994, no writ).  In an offer of
settlement or compromise, a party concedes some right to which he believes he
is entitled in order to bring about a mutual settlement.  Mercedes-Benz of N. Am. v. Dickenson,
720 S.W.2d 844, 857 (Tex. App.CFort
Worth 1986, no writ).  But rule 408 does
not bar the admission of settlement offers when offered for another relevant
purpose.  Tex. R. Evid. 408; Barrett v. U. S. Brass Corp., 864 S.W.2d 606, 633 (Tex. App.CHouston
[1st Dist.] 1993), rev=d on
other grounds sub nom, Amstadt v. U.
S. Brass Corp., 919 S.W.2d 644 (1996).  Thus, an offer or demand for settlement may
be admissible for another purpose, such as to demonstrate bias or
prejudice.  Tex. R.  Evid. 408; Gen. Motors Corp. v. Saenz, 829 S.W.2d 230, 243 (Tex. App.CCorpus
Christi 1991), rev=d on
other grounds, 873 S.W.2d 353
(Tex. 1993); C & H Nationwide, Inc. v. Thompson, 810 S.W.2d 259, 269 (Tex. App.CHouston
[1st Dist.] 1991), rev=d on
other grounds, 903 S.W.2d 315
(Tex. 1994); Ochs v. Martinez, 789 S.W.2d 949,
959B60
(Tex. App.CSan
Antonio 1990, writ denied) (op. on reh=g).

The
burden is on the party objecting to evidence under rule 408 to show that it was
a part of settlement negotiations and not offered for another purpose.  TCA Bldg.
Co. v. Nw. Res. Co., 922 S.W.2d 629, 636 (Tex.
App.CWaco
1996, writ denied); Haney v. Purcell Co., Inc., 796 S.W.2d
782, 790 (Tex. App.CHouston [1st Dist.] 1990,
writ denied).  Whether the evidence is
being impermissibly offered as evidence of liability or for some other valid
reason is a matter within the trial court=s
discretion.  Tatum, 881 S.W.2d at 837.  Only when the trial court abuses its
discretion will its ruling be disturbed on appeal.[10]  See id.

XTO
contends that, when the Ademand@
language is properly viewed in the context of the remainder of the May 12
letter and the parties=
ongoing negotiations, the letter was clearly a part of settlement negotiations,
not a demand for payment of undisputed amounts triggering forfeiture of the
leases if not paid.[11]  XTO points out that
the May 12 letter=s first paragraph begins: AIn
response to your March 16, 2006, letter regarding possible settlement of this matter, . . . .@
[Emphasis added.]  Moreover, the very
paragraph of the letter the Vinsons rely upon as
setting forth the demand begins by expressly acknowledging, immediately before
the words they claim to be a demand for payment, that a settlement had not
been reached, stating:  AUntil
agreement on each of these matters is reached . .
. .@
[Emphasis added.]  Immediately following
the demand language, that same paragraph references payment of such undisputed
amounts as a part of a proposed settlement, stating that A[A]s
a part of any settlement of this issue, XTO
will also have to confirm@ that it will provide various production information in a timely manner. [Emphasis
added.]

Then,
as XTO notes, the letter closes with a
straightforward compromise settlement demand for the entire case, stating that
the Vinsons value the case at more than $30 million,
but A[r]ecognizing the risks of litigation and the costs associated
therewith, I have been authorized to settle all claims in exchange for a
payment in the amount of $9,500,000.@
[Emphasis added.]  The Vinsons deny that the last paragraph of the letter was
intended to constitute a settlement demand for all claimsCincluding
their claim for unpaid royaltiesC and
insist that the letter made clear that the Vinsons=
counsel was only authorized to settle all other matters for a specified
amount.  We disagree with the Vinsons=
post hoc interpretation.  AAll
claims@
necessarily includes the Vinsons=
claim for unpaid royalties, which were sought in the pending litigation.

The
May 12 letter speaks for itself.  It
begins with a discussion of settlement, states that it is in response to XTO=s request for a settlement
demand, clearly and unambiguously concludes with a settlement demand for Aall
claims,@ and
was written during the parties=
ongoing negotiations for settlement of an existing lawsuit that included the Vinsons=
claim for underpayment of royalties.  The
May 12 letter also concludes by conceding a right to which the Vinsons believe they are entitled.  See Mercedes‑Benz,
720 S.W.2d at 857 (holding that an offer of
compromise exists when a party concedes some right to which he believes he is
entitled to bring about a mutual settlement). 
Specifically, the letter concludes with a valuation of Athis
case@
greatly in excess of $30 million and an offer to settle Aall
claims@ for
$9.5 million.  The language and context
of the letter negate any reasonable interpretation of the language buried in
the middle of a sentence, buried in the middle of a paragraph, and buried in
the middle of the three-page letter as a stand-alone Ademand@ for
payment under Section 3(e) of the leases that can be considered separate and
apart from the rest of the letter.

The
purpose of rule 408 is to encourage settlement.  See MG Bldg. Materials, Ltd. v. Moses Lopez
Custom Homes, Inc., 179 S.W.3d 51, 61 (Tex. App.CSan Antonio 2005, pet.
denied); State Farm Mut. Auto Ins. Co. v. Wilborn, 835 S.W.2d 260, 261
(Tex. App.CHouston
[14th Dist.] 1992, orig. proceeding) (noting settlement offers are excluded to
allow a party to Abuy his peace and encourage
settlement of claims outside the courthouse@).  Permitting a party to recharacterize,
after the fact, what was clearly a settlement demand as a ADemand
Letter,@ to
use the Vinsons=
label, based upon part of a sentence inserted in the middle of a letter
otherwise ostensibly devoted from beginning to end to compromise and
settlement, in order to invoke the harsh consequences of forfeiture, would
reward obfuscation and Agotcha@
tactics and would chill rather than encourage parties to negotiate in good
faith toward a compromise and settlement of their claims.

By
granting XTO=s
motion to exclude, the trial court could have found, within its discretion,
that the May 12 letter was not a Ademand
letter@
sufficient to trigger a forfeiture under the terms of the leases but was part
of a settlement demand inadmissible under rule 408 offered solely to prove XTO=s liability for forfeiture
of its leases.  Cf. Mercedes‑Benz, 720 S.W.2d
at 857 (holding trial court was within its discretion to determine a letter Awas
more in the nature of an ultimatum than an offer to compromise@
and, therefore, admissible into evidence). 
We will not disturb the exercise of the trial court=s
discretion in excluding the May 12 letter from the summary judgment
evidence.  See id.; Allen v.
Avery, 537 S.W.2d 789, 791 (Tex. App.CTexarkana 1976, no writ)
(upholding trial court=s exclusion of compromise
settlement from evidence).  We overrule
the Vinsons=
second issue.

B.      Insufficient Evidence Existed to Raise an
Issue of Fact as to Notice and Demand to Entitle the Vinsons
to Forfeiture of the Leases.

 

 








The Vinsons contend in their first issue that the trial court
erred by denying their motion for summary judgment and granting XTO=s motion for summary
judgment because the May 12 letter constituted written demand for payment, XTO failed to pay those sums within sixty days, and the
leases expressly provide that they may be terminated if Aundisputed@
sums are not paid within sixty days of written demand.  But even if the trial court erred by
excluding the May 12 letter from evidence as a demand, the Vinsons
were only entitled to damages, not forfeiture of the leases.  Thus, the Vinsons
have failed to show how the exclusion of the May 12 letter led to rendition of
an improper judgment.  See Tex. R.
App. P. 44.1(a).

The
promise to pay royalties is generally a covenant,[12]
which will give rise only to a remedy of damages in absence of a specific
clause allowing the option of termination of the lease upon the lessee=s
failure to pay.  Blackmon, 276 S.W.3d at 606 (citing Linton E. Barbee, The Lessor=s
Remedies for Nonpayment of Royalty, 45 Tex. L. Rev. 132, 159
(1966)).  As XTO
acknowledges, the Vinson leases are among the Afew@
that contain a specific clause making non-payment of royalties a condition
subsequent, expressly permitting the Vinsons, as lessors, to elect to seek forfeiture of the lease.  See Barbee, 45 Tex. L. Rev. at 159B60.

Upon
breach of a condition subsequent, the lessor must
elect between seeking damages or forfeiture; the lease is not automatically
terminated upon breach.  Blackmon,
276 S.W.3d at 605; see Chicago, T. & M.C. Ry Co. v. Titterington, 84 Tex. 218, 223B24,
19 S.W. 472, 474 (1892).  The lessor must take affirmative steps by re-entering or
seeking a judicial declaration of forfeiture as the Vinsons
did in this case.  See Barbee, 45
Tex. L. Rev. at 159.

The
rule of strict construction disfavoring forfeiture applies when a forfeiture is claimed for breach of a condition
subsequent.  Coastal Oil & Gas
Corp. v. Roberts, 28 S.W.3d 759, 763 (Tex. App.CCorpus Christi 2000, pet.
granted, judgm=t
vacated w.r.m.); Tickner
v. Luse, 220 S.W. 578, 589 (Tex. Civ. App.CEl
Paso 1920, writ ref=d); see Patrick H.
Martin & Bruce M. Kramer, 3 Williams & Meyers, Oil and Gas Law '
656.2 (2008) (stating that strict construction Agoverns
forfeiture provisions based on failure to make proper and timely payment of
royalty@).  It is settled law that the rule of
construction against the right of forfeiture applies to oil and gas
leases.  Wisdom v. Minchen,
154 S.W.2d 330, 334 (Tex. Civ. App.CGalveston
1941, writ ref=d w.o.m.) (citing Ryan v. Kent,
36 S.W.2d 1007, 1011 (Tex. Comm=n
App. 1931, judgm=t
adopted)).  Thus, if the lease contract
is susceptible of two reasonable interpretations, it should be construed as to
prevent a forfeiture. 
Ryan, 36 S.W.2d at
1011; Wisdom, 154 S.W.2d at 334.

Additionally,
if the lease contains a provision giving the lessee a right of notice of any
breach or default before declaring any forfeiture, it must be Aliterally
complied with.@  Coastal, 28 S.W.3d
at 763 (citing Deace v. Stribling,
142 S.W.2d 564, 566 (Tex. Civ. App.CAustin
1940, no writ).  Under such a provision,
the lessor cannot claim a
forfeiture without giving the lessee the benefit of notice of any
default and an opportunity to remedy it. 
Wisdom, 154 S.W.2d at
334.

The Vinsons contend that this case is controlled by Coastal
Oil & Gas Corp. v. Roberts, in which a global demand referencing no
stated amount of royalties due, and not mentioning termination, was
nevertheless held sufficient to entitle the lessor to
forfeiture of a lease under a provision that, according to the Vinsons, is almost identical to Section 3(e) of their
leases.  See 28 S.W.3d at 764B65.  We agree that Coastal is similar to
this case but find it distinguishable in material respects.

Paragraph
3 of the Coastal leases, specifically regarding royalties and other
payments for production, and similar to section 3(e) of the Vinsons=
leases, provided:

Royalties
and other payments for production shall be due and owing to Lessor
within 120 days from the date of first production . . . .  If Lessee wrongfully or unreasonably
withholds any such payment or payments due to Lessor
for a period of thirty (30) days after written demand for payment is made by Lessor on Lessee at the above address (or other such
address as made by [sic] specified in writing hereafter by Lessee), at the
election of Lessor this lease may be terminated.

 

Id. at
761B62.

Litigation
had been pending by the lessor against Coastal for
several years for underpaid royalties on several other leases, but not for the AE@ or AF@
lease.  See id. at
761.  Coastal, as lessee, failed to pay
any royalties due on the F-6 well on its AF@
lease by the 120th day after first production of gas from the well it drilled
on that property.  See id. at 762.  Coastal
suspended payment of any royalties due on the F-6 well while it awaited return
of a signed division order from the lessor.  See id.  Without returning the division order, the lessor sent a written demand letter that read, in toto, as follows:

Plaintiffs
hereby make demand for all royalties due and owing pursuant to each paragraph 3
of the (a.) Coates AE@
lease and (b.) Coates AF@ lease.  Plaintiffs demand payment in full from each
separate defendant, their proportionate share of all amounts due.  You have thirty (30) days, after receipt of
this letter, to pay said amounts.  We appreciate
your immediate attention to this matter.

 

 








Id.  The lessor
subsequently amended its pleadings in the existing suit and sought to terminate
the lease based upon Coastal=s Awrongful
or unreasonable@ failure to pay royalties
after written demand for payment.  See
id.  Coastal contended that the lessor failed to give proper notice because the generic
written demand letter did not explain the amounts owed, how Coastal had
improperly calculated royalties, or how the lessor
wished royalties to be calculated, and was thus Ainsufficient,
deliberately vague and written in such a way as to keep [Coastal] from being
able to adequately respond.@  Id.  The Corpus Christi Court of Appeals affirmed a
summary judgment for the lessor, holding that the
written demand sufficed to invoke the right of the lessor
to terminate, despite the rule that oil and gas leases must be construed
against forfeiture,[13]
and despite the additional rule that the prerequisites of notice of forfeiture
must be Aliterally
complied with@[14]
because the Coastal lease did not require the lessor
to explain the particulars of the breach or to specify how the lessee had
defaulted and, thus, the lessor=s
global demand did Aliterally compl[y]@
with the requirement of written demand for payment.  Id. at 763B65. 
Coastal differs significantly from this case.  First, the demand in Coastal was
clearly a Awritten
demand@ as
required by the lease, unlike the alleged demand here, which was contained
within a letter offering to settle the pending litigation.  See id. at
762.  Coastal clearly recognized the
demand as such because it responded and complained that the demand letter was
inadequate.  See id.  Most significantly, the Corpus Christi court=s
holding in Coastal that the lessor Aliterally
complied@
with the forfeiture clause rests upon the absence of any language in that lease
requiring the lessor to describe the breach or
specify the particulars of the default.  See
id. at 764. 
Holding that Aliteral compliance@
with the prerequisite of notice to forfeit did not require the lessor to identify the specifics of the breach, the court
of appeals noted in a footnote:

An
example of a clause in a lease requiring the lessor
to indicate the specifics of the breach is found in 4 HOWARD R. WILLIAMS &
CHARLES J. MEYERS, OIL & GAS LAW ' 682.1, at 340 (1984) (citing Ridl v. E.P. Operating
Limited Partnership, 553 N.W.2d 784 (N.D.
1996)).  The clause provides, in relevant
part, AIn the event the Lessor considers that Lessee has failed to comply with an
obligation hereunder, express or implied, Lessor shall notify Lessee in writing specifying in what
respect Lessor claims Lessee has breached this lease
. . . .

 

Id. at 764 n.3.

The
leases in this case, unlike the one in Coastal, do contain such a clause
as the example cited in the footnote, requiring the Vinsons,
as lessors, to provide written notice Afully
describing the breach or default@ to
entitle them to forfeiture of the leases. 
Section 11 of the leases, applicable to all breaches or defaults,
states:

No
litigation shall be initiated by [the Vinsons] for
damages, forfeiture, or cancellation with respect to any breach or default by [XTO] hereunder, for a period of at least sixty (60) days
after [the Vinsons] ha[ve] given [XTO] written notice fully
describing the breach or default, and then only if [XTO]
fails to remedy the breach or default within such period. [Emphasis added.]

 

The lease in Coastal
contained no such provision, and the court refused to write into the contract a
requirement that it did not provide.  Id. at 764B65.  Compare Ridl,
553 N.W.2d at 784 (lessor=s
demands not Aspecifying
in wShat respects@
lessee breached lease, as required by notice clause, not appropriate demand
entitling lessor to forfeiture), and Savoy v.
Tidewater Oil Co., 218 F. Supp. 607, 610 (W.D.
La. 1963) (notice required lessor to Apoint
out the particulars in which they were deemed deficient@ to
allow forfeiture), aff=d,
326 F.2d 757 (5th Cir. 1964), and Mont. E.
Pipe Line Co. v. Shell Oil Co., 216 F. Supp. 214, 221 (D. Mont. 1963)
(notice should Aexpress clearly the
dereliction of which complaint is made@), with
Sowell v. Natural Gas Pipeline Co. of Am., 789 F.2d
1151, 1156 (5th Cir. 1986) (applying Texas law) (notice and demand clause
contained no condition requiring specific facts of breach but demand letter
identified proper royalty as based upon six-county average gas price specified
in division order).

The Vinsons did not comply with Section 11>s
notice provision requiring them to Afully
describe@ the
breach or default.  They offered no
answer to the prerequisites of notice and cure under Section 11 of the leases in
their opening brief except to assert that Sections 11 and 3(e) involve Adifferent
circumstances.@  For the first time in their reply brief, they
argue that they repeatedly made their complaints known in writing in their
audit exceptions provided to XTO as early as March
2005, and more than 60 days expired before they brought suit.  But none of those communications specified
any amount due or gave XTO a time within which to
cure the alleged default.  For example,
the Vinsons=
audit exception with respect to the improper transportation charges stated only
that Athe
Dollar amount . . . to be determined but is estimated . . . to be in the range
of $600,000.@  And none of their communications claimed any
amount to be Aundisputed.@[15]  Thus, even if the language in the May 12
letter was intended to constitute notice, it was for an unspecified amount to
be paid by an unspecified time for unspecified claims or charges, as to all of
which XTO was left to guess.  Where forfeiture of a lease is dependent on
the making of a demand for performance, the demand must be proper, specific,
and reasonable.  Outdoor Sys., Inc. v.
BBE, L.L.C., 105 S.W.3d 66, 71 (Tex. App.CEastland
2003, pet. denied) (holding that a lessor=s
demand letter was excessive, unreasonable, and imprecise when it demanded
payment within ten days of an unspecified amount based upon Atotal
arrearages from the inception of the Leases@).

The Vinsons= May
12 letter states neither a time limit within which XTO
is to make the payments nor notice of any amount other than the $9.5 million
proposed for settlement of all claims.  See
id.  Moreover, the Vinsons have never identified any amount that was Aundisputed@
either in the trial court or in this court. 
The Vinsons acknowledge as much in their reply
brief in this court, conceding that they Acould
not know what was undisputed by XTO; thus, [they]
could not demand a specific amount.@  If the Vinsons
could not know the amount they were demanding to be paid by XTO,
it is difficult to see how they can argue that XTO
had notice of what amount was Aundisputed.@

The Vinsons=
solution to this conundrum is to argue that A[e]ven if XTO was uncertain as to
exactly how much money it owed, it clearly knew (from the parties=
prior dealings and discussions) that it owed [the Vinsons]
in excess of $600,000; accordingly, it had a duty to tender the portion that
was undisputed.@  The Vinsons also
quote from the September 25, 2006 deposition of XTO=s
accounting representative, in which she stated that upon recalculating the
monies due to the Vinsons, she came up with an amount
Ain
the neighborhood of $650,000 to $700,000,@
that she estimated the amount owed for the Antero period for transportation
charges was $643,548.19, and that she agreed with the Vinsons=
counsel=s
estimate that XTO recognized since at least January
of 2006 that it owed Asomething north of $600,000@ for
past due royalty.  The Vinsons cite no authority defining Aundisputed@ to
include an Aestimated@
amount, nor do we agree that Ain
the neighborhood ofA or Asomething
north of@ a
particular amount equates to an Aundisputed
amount.@

The
May 12 letter is insufficiently specific to constitute Awritten
notice fully describing the breach or default@ as
required by Section 11 of the leases, particularly in the context of the
remainder of the letter and the ongoing negotiations for settlement.  See id.; see also Cedar Rapids
Television Co. v. MCC Iowa LLC, 560 F.3d 734, 739B40
(8th Cir. 2009) (holding notice of termination of a contract must be Aclear
and unequivocal@ and state a definite intent
to cancel or terminate the contract); Laverty v. Hawkeye Sec. Ins. Co.,
140 N.W.2d 83, 87 (Iowa 1966); Morris Silverman
Mgmt. Co. v. W. Union Fin. Serv., Inc., 284 F. Supp. 2d
964, 974 (N.D. Ill. 2003) (citing LA-Nev. Transit Co. v. Marathon Oil Co.,
985 F.2d 797, 800 (5th Cir. 1993) (AThe
focus is on whether the notice is sufficiently clear to apprise the other party
of the action being taken.@)); see
also Accu-Weather, Inc. v. Prospect Comm. Inc.,
644 A.2d 1251, 1254 (Pa. Super. Ct. 1994) (holding
conditions precedent to termination must be strictly complied with, and clear
and unequivocal language is necessary to terminate); Morris Silverman,
284 F. Supp. 2d at 974 (A[T]o
be effective, notice of termination must be >clear
and unequivocal.=@); Todd
v. Corp. Life Ins. Co., No. 89-C-7711, 1990 WL 16430, at *4 (N.D. Ill. Feb.
15, 1990), aff=d in
part, rev=d on other grounds,
945 F.2d 204, 208 (7th Cir. 1991) (A[N]otice to terminate a contract under an express provision
must be clear and unequivocal.@).

The
May 12 letter also fails to give XTO notice that the Vinsons intended to seek the drastic remedy of forfeiture
of the leases if payment was not made within any certain time.  Specifically, written notice seeking to
invoke the harsh remedy of termination or forfeiture must be clear and
unambiguous.  See Ogden v. Gibraltar Sav. Ass=n,
640 S.W.2d 232, 233B34
(Tex. 1982) (holding that equity demands clear and unequivocal notice be given
of a party=s
intent to exercise such harsh consequences as acceleration or foreclosure); see
also Shumway v. Horizon Credit Corp., 801 S.W.2d 890, 891B92
(Tex. 1991) (holding harshness of option of accelerating maturity of extended
indebtedness requires both strict reading of terms of option and notice to
debtor, and notice of intent and notice of acceleration must be clear and
unambiguous); Outdoor Sys., Inc., 105 S.W.3d
at 71 (AThe
cases in this State hold that a landlord cannot forfeit the lease of his tenant
for failure to comply with the provisions without first making demand upon the
tenant for performance.@); Barbee, 45 Tex. L. Rev.
at 161 (stating terms of a claim for forfeiture of an oil and gas lease must be
clear and unambiguous and lessor is held to strict
proof of compliance with notice and demand requirements).

The Vinsons argue that the reference in the letter to the Wise
County leases and the words Aundisputed
payments@ and
Ademand@
were sufficient to alert XTO that the Vinsons were seeking to invoke Section 3(e) of the leases,
which allowed an election for forfeiture. 
Even if the letter was sufficient to invoke Section 3(e) as a demand for
payment, it was not sufficient for them to invoke termination under Section 11.  The May 12 letter was written in the context
of settlement negotiations for numerous claims for alleged breaches of
covenants and conditions.  At best, an
analogy may be made to cases under the Uniform Commercial Code, where attempted
notices of termination of a contractCAmixed@
with words of negotiation and compromiseChave
been held ineffective as a matter of law. 
See, e.g., Stovall v. Pub.
Paper Co., 584 P.2d 1375, 1380 (Or. 1978)
(holding notice of termination insufficient where it mixed words of termination
with words of compromise, negotiation, and present obligation); Morris
Silverman, 284 F. Supp. 2d at 974 (holding notice
of termination ineffective where party made repeated oral and written
statements that it intended to continue contract); Gatt
Trading Co. v. Sears, Roebuck, & Co., No. 02-CV-1573-B, 2004 WL
2511894, at *10 (N.D. Tex. Nov. 8, 2004) (holding letter attempting to
terminate insufficient where it invited further negotiation); Accu-Weather, 644 A.2d
at 1254 (holding notice of termination that made reference to continuing
contract to later date held Aineffectively
ambiguous@); cf.
Dresser Indus., Inc. v. Pyrrhus AG, 936 F.2d 921,
930 (7th Cir. 1991) (holding notice clearly invoking termination clause that
also indicated willingness to negotiate sufficient where notice also stated
further discussions would not limit effect of termination notice).

Because
we have determined that the trial court did not abuse its discretion by
excluding the May 12 letter from evidence, and because we conclude that the May
12 letter was also insufficient as a matter of law to constitute a proper
written notice fully describing the breach or default in order for the Vinsons to seek forfeiture, we hold that the May 12 letter
is no evidence that the Vinsons provided XTO with a proper Awritten
demand@ for
payment or notice of default as required by the leases, entitling them to a
declaratory judgment forfeiting the leases.

Alternatively,
the Vinsons argue that they made a sufficient demand
by filing their amended petition and attaching the May 12 letter with all three
pages of text redacted except the few words in the middle of the letter that
they contend is a demand.  However, by
precluding initiation of litigation until notice has been provided, the lease
agreements effectively prevent the use of a pleading to make a demand.  Moreover, the Vinsons
did not make a Ademand@ by their
amended pleading.  Rather, they used XTO=s alleged failure to pay
within sixty days after May 12, 2006, as the reason to assert their election to
terminate.

As
previously discussed, Section 11 of the leases precluded the Vinsons from Ainitiat[ing] litigation@
unless XTO had received Awritten
notice fully describing the breach or default@ and
had Afail[ed] to remedy the breach or default within@
sixty days of receiving the notice. 
Because suit could not be filed until XTO had
at least sixty days after notice in which to remedy the breach or default, the
letter=s
attachment to the Vinsons=
amended petition could not serve as the required notice of default.  See Deace, 142 S.W.2d at 566 (holding prerequisite of thirty days=
written notice to cancel or terminate lease prior to filing of suit not
literally complied with and, therefore, ineffective where suit was brought
twenty-five days after notice); see also Westwind
Exploration Inc. v. Homestate Sav.
Ass=n,
696 S.W.2d 378, 382 (Tex. 1985) (holding that
contracting parties intend every clause to have some effect); Lacquement v. Handy, 876 S.W.2d
932, 937 (Tex. App.CFort
Worth 1994, no writ) (stating that language in contracts is given its plain,
ordinary meaning).

Moreover,
we do not agree that attaching the redacted letter to XTO=s
amended petition was sufficient to meet the leases=
pre-suit notification requirement.  See Huff v. Fid. Union Life Ins. Co., 158
Tex. 433, 443, 312 S.W.2d 493, 500 (1958) (holding
that neither the filing of a lawsuit Aarising
out of a contract nor the allegation of a demand in the pleadings constitutes
presentment of a demand@ to entitle a party to
attorney fees as required by Chapter 38 of the Texas Civil Practice and
Remedies Code); see also Richardson v. Foster & Sear, L.L.P., 257 S.W.3d 782, 785
(Tex. App.CFort
Worth 2008, no pet.) (stating that the filing of a
lawsuit does not constitute the sixty-day pre-suit notice of a Deceptive Trade
Practices Act claim as required by section 17.505(a) of the business and
commerce code).

Absent
proper notice under Section 11 of the leases, the Vinsons
are not entitled to forfeiture of the leases, even if the May 12 letter
constituted a proper Awritten demand@ for
payment.  Finding no evidence that the Vinsons provided XTO legally
sufficient written notice or demand for payment of undisputed sums as required
by the terms of the leases, we hold that the trial court correctly granted XTO=s no-evidence motion for summary
judgment.  For the same reasons, we hold
that the Vinsons failed to establish entitlement to a
traditional summary judgment declaring the leases forfeited for XTO=s failure to pay undisputed
amounts within sixty days of a written demand. 
We overrule the Vinsons=
first issue.[16]

V. CONCLUSION

Having
overruled the Vinsons=
first and second issues and having found it unnecessary to address the Vinsons=
third issue, we affirm the trial court=s
judgment.

 

ANNE GARDNER

JUSTICE

 

PANEL:  LIVINGSTON, C.J.;
GARDNER and WALKER, JJ.

 

LIVINGSTON,
C.J. filed a concurring opinion.

 

DELIVERED:  December 16, 2010

 

 

 

 











 
 
 
 
 
 
 




 

 

 

 

 

 

                                                COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                               NO.
02-08-00453-CV

 

 


 
 
 VINSON MINERALS,
 LTD., JOHNNY H. VINSON AND CHISHOLM 2000, L.P.
 
 
  
 
 
                                   APPELLANTS
 
 
 
 
 
  
 V.
  
 
 
 
 
 
 
 XTO ENERGY, INC.
 
 
 
 
  
 
 
 
 
 APPELLEE
 
 
 




 

------------

 

FROM THE 271ST DISTRICT COURT OF WISE COUNTY

 

------------

 

CONCURRING OPINION

----------

I
respectfully concur with the majority opinion and write separately only to make
some distinctions regarding the rule 408 admissibility question raised by the Vinsons= May
12, 2006 Ademand@
letter and the sufficiency of their Aelection
of forfeiture.@  See Tex. R. Evid.
408.

Texas
Rule of Evidence 408 mandates exclusion of evidence of settlement offers unless
offered for some reason other than to establish liability.  Id. 
Additionally, the burden is on the objecting party to show that
the evidence was not offered for some other reason or purpose allowed by rule
408.  See In re Univar
USA, Inc., 311 S.W.3d 175, 182 (Tex. App.CBeaumont 2010, orig.
proceeding).  And courts have recognized
the admission of some portions of settlement agreements if relevant for proof
of some other element than liability. Id.

Because
the letter was written in response to XTO=s
request to provide such a Asettlement
demand,@ the
Vinson demand letter must be read in context with that preceding request.  Basically, XTO
asks, AWhat
will it take to settle all the various other/remaining claims [other than the
accounting/royalty issues] asserted in the Vinsons=
latest pleading?@  In other words, XTO=s
letter implies that it believes they have basically resolved the
accounting/royalty issues.  And
apparently, the May 12, 2006 Vinson letter acknowledges this:  A[T]his
issue should be resolved.@  However, that belief is clearly contingent
upon XTO=s
performance in accordance with the representations it had made to the Vinsons regarding the accounting/royalty issues.  Furthermore, the Vinsons
follow this statement with a clear demand for Aall
undisputed payments due under the Wise County leases.@  As the Vinsons
point out, XTO admits that it has calculated and is
ready to pay undisputed amounts, amounts that necessarily can only be fully
determined by XTO. 
Thus, I believe that this portion of the May 12, 2006 letter is a demand
for payment of undisputed amounts, not evidence of a settlement offer, and that
the trial court abused its discretion in excluding this portion of the Vinsons=
response under rule 408.  This portion of
the letter was admissible because it was offered for Aanother
purpose than validity of the claim.@  Tex. R. Evid.
408.

As
to the forfeiture issue, we are to construe oil and gas leases disfavoring
forfeiture.  See Coastal Oil & Gas
Corp. v. Roberts, 28 S.W.3d 759, 763 (Tex. App.CCorpus Christi 2000, pet. dism=d by agr.).  If a lease states how to give notice of
demand or forfeiture, such notice must comport with the lease.  Id. at 764.

Here,
the remaining question is whether this portion of the letter is a sufficient
demand and whether it made clear that failure to perform within a certain time
would result in the Vinsons exercising their
forfeiture rights.  I would agree with
the majority as to the insufficiency of the forfeiture.  The accounting/royalty demand portion gave no
notice of a time limit within which to perform, which the lease states can be
no less than sixty days with prior written notice.  Furthermore, and more importantly, the last
paragraph of the letter, which would have also had to have been admitted,
includes the value of the entire Acase@ and
is an offer to settle Aall claims.@  Again, there is no notice or mention of the
possibility of forfeiture.  And as XTO points out, the last paragraph refutes the claim of
forfeiture because the Vinsons offered to settle all
aspects of the case for a sum certain. 
Thus, I believe, and would conclude, that the letter, although
admissible in part, provided insufficient notice of what performance was
required and when and insufficient notice that the failure to timely perform
would result in the exercise of the election to forfeit the leases.

Because
my analysis would result in the same affirmance of
the trial court=s granting of XTO=s motion for summary
judgment, I join in the judgment of the court and concur only to set forth
these distinctions.

 

 

TERRIE LIVINGSTON

CHIEF JUSTICE

 

DELIVERED:  December 16, 2010













[1]In his affidavit,
Threshold=s CFO stated, AAlthough I was unable to
calculate a precise figure at that time because I had not received all
documentation I had requested, I was able to arrive at the estimate within a
matter of hours, and I noted it in the audit exceptions.@





[2]In the letter, XTO observed that Arelations between Antero and [the Vinsons] had deteriorated to a point that discussions for a
reasonable resolution of some or all of the issues of the lawsuit became
impossible.@





[3]Following XTO=s acquisition of
Antero, XTO received 348 boxes of Antero records.  To establish the $643,548.19 estimate, XTO Apieced together@ information
contained in 59 boxes from Antero labeled Aaccounting records.@  However, at the time of this estimate, XTO was finding numerous accounting records in the other
289 boxes.  The document XTO provided to the Vinsons that
contained its estimate was titled APreliminary Accounting Review@ and included the
following notation:  AThese are preliminary
findings only.  All calculations are
subject to further examination and revision by XTO
Energy, Inc. Accounting personnel.@





[4]The last paragraph of
the order, in part, states: 

 

[The Vinsons] and [XTO] further agree
that at certain times in this Lawsuit, it may be necessary for representatives of
both [the Vinsons] and [XTO]
to meet in person or via telephone, without counsel for either [the Vinsons] or [XTO] present, to
discuss certain accounting issues raised in this Lawsuit.  Such informal meetings . . . shall be
governed by Texas Rule of Evidence 408.





[5]Joni Van Meter, XTO=s accounting
representative, explained in her September 2007 deposition that she was able to
calculate applicable charges for gathering and transporting already in XTO=s own computer
system, to give them separate deduct codes, and to flag royalties for each
individual owner as being exempt from those deductions.





[6]The Vinsons dispute that the Amethodology@ issue had anything
to do with the amounts they claim for underpaid royalties but had to do with
Antero=s improper use of
weighted averages and composite rates in calculating the royalties.  According to the Vinsons,
royalties were not being calculated on the higher of the proceeds from sale of
the gas or the market value but simply on the amount realized, contrary to the
leases, and XTO=s proposal was to use an index price to
simplify calculations.  The Vinsons provide no record references to support this
proposition but contend that the changed methodology would have no effect on
the Aundisputed amounts@ at issue.





[7]The Vinsons= amended pleading
attached a copy of the May 12 letter with all parts redacted except the single
paragraph relied upon by the Vinsons as their demand
for payment.  Only when this amended
pleading was filed did XTO=s counsel learn of
the Vinsons= interpretation of the May 12 letter as a Ademand@ that allegedly
entitled them to termination of the leases.





[8]The Vinsons omitted the last sentence of Section 3(e) of the
leases in their amended petition and in their opening brief in this Court.  Because we resolve this appeal on other
grounds, we do not reach XTO=s cross-point that
the summary judgment may be upheld on the ground, raised in its motion for
summary judgment and not addressed by the Vinsons on
appeal, that the Vinsons produced no evidence that
the payments were not contested by XTO in good faith.





[9]The Vinsons sought partial summary judgment because other
claims were pending at the time the motion was filed.





[10]The abuse of
discretion standard of review is limited to the trial court=s determination to
exclude the May 12 letter from evidence. 
We review the trial court=s summary judgment ruling de novo.  Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding, 289 S.W.3d 844, 848 (Tex. 2009).





[11]As late as October
2007, the Vinsons represented to the trial court in a
AMemorandum of
Settlement,@ filed in response to
an order of the trial court prior to a scheduling conference, that the Abulk of the parties= settlement
discussions to date have focused on [the Vinsons=] royalty claims.@





[12]There are three primary
qualifications generally imposed on the various ownership interests created by
an oil and gas lease: (1) general and special limitations, (2) conditions
subsequent, and (3) covenants.  A.W. Walker, Jr., The Nature of the Property Interests
Created by an Oil and Gas Lease in Texas, 8 Tex. L. Rev. 483, 483B84 (1930); see
Blackmon v. XTO Energy, Inc., 276 S.W.3d 600, 605 (Tex. App.CWaco 2009, no pet.).





[13]See id. at 763 (citing Cambridge
Oil Co. v. Huggins, 765 S.W.2d 540, 542B43 (Tex. App.CCorpus Christi 1989,
writ denied); see also Reilly v. Rangers Mgmt. Inc., 727 S.W.2d 527, 530 (Tex. 1987); TSB
Exco, Inc. v. E.N. Smith,
III Energy Corp., 818 S.W.2d 417, 422 (Tex. App.CTexarkana 1991, no
writ).





[14]Coastal, 28 S.W.3d at 763; see Deace,
142 S.W.2d at 566 (holding that suit brought
twenty-five days after notice to lessee could not be maintained where lease
required thirty days notice because authorities hold Aprerequisite of
notice to forfeit contained in a lease must be literally complied with@).





[15]During oral argument,
the parties vehemently disputed the meaning of the term Aundisputed@ contained in Section
3(e) of the leases.  XTO
contended that both parties must have agreed on an amount for it to be Aundisputed,@ whereas the Vinsons argued that only XTO
could know whether it disputed the amount owed. 
To the extent that both interpretations may be reasonable, we must adopt
the construction that avoids forfeiture. 
Coastal, 28 S.W.3d at
763; Wisdom, 154 S.W.2d at 334.  We conclude that the term Aundisputed@ as used in Section 3(e)
of the leases requires a specific amount to be undisputed by both parties,
which was never the case here.





[16]Because the summary
judgment in favor of XTO may be upheld based upon no
evidence of a sufficient demand, we need not consider the Vinsons= third issue as to
whether the trial court erred by excusing XTO=s compliance and by
applying the doctrine of disproportionate forfeiture, nor need we consider XTO=s alternative grounds
raised in the trial court to sustain its summary judgment based on no evidence
that it Awrongfully or
unreasonably@ withheld undisputed
payments or did not act in Agood faith@ in contesting such
payments under Section 3(e).  See
Tex. R. App. P. 47.1.